UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

---

In re:

STAMP FARMS, L.L.C., *et al.*[1],

                  Debtors.

---

)  Case No.  12-10410
)  Chapter 7
)  Hon. Scott W. Dales
)  Jointly Administered
)
)

## FINAL APPLICATION OF VARNUM LLP FOR APPROVAL AND
## PAYMENT OF FEES AND EXPENSES AS COUNSEL TO THE DEBTORS

Varnum LLP ("**Varnum**"), counsel to the Debtors, for its Final Fee Application ("**Final Application**") for approval and payment of all professional fees and expenses of Varnum in these Chapter 11 cases, including for the period from March 1, 2013 through May 29, 2013 (the "**Application Period**") pursuant to 11 U.S.C. §330 and Local Bankruptcy Rule 9013-1, says as follows:

### Introduction

1.        On November 30, 2012 (the "**Petition Date**"), each of the Debtors filed its voluntary petition with the Court under Chapter 11 of the Bankruptcy Code; and, on December 7, 2012, this Court entered its Order Authorizing Joint Administration of Related Chapter 11 Cases [Docket No. 65] (hereinafter, the "**Cases**").

2.        No trustee was appointed in these Cases and the Debtors conducted an orderly liquidation of their assets as debtors-in-possession until May 29, 2013, when these Cases were converted to Chapter 7 cases by Order of this Court [Docket No. 803].

3.        This Final Application has been prepared and filed in accordance with LBR 2016-2 and 9013(c), Fed. R. Bankr. Proc. 2016 and the Guidelines for Reviewing Applications for

---

[1] This case is jointly administered with the following cases:  *In re: Stamp Farms Trucking, L.L.C.* (Case No, 12-10411); *In re Stamp Farms Custom AG, L.L.C.* (Case No. 12-10416); and *In re Royal Star Farms, L.L.C.* (Case No. 12-10417).

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. §330 (Appendix A to 28 C.F.R. §58 (the "**Guidelines**").

### Information About the Applicant and the Application

4.      Varnum was engaged by the Debtors as their legal counsel in these Cases and commenced rendering services to the Debtors in this Case on November 30, 2012.

5.      On December 17, 2012, Varnum filed the Debtors' Application for Authority to Retain and Employ Varnum LLP as Counsel to the Debtors Retroactive to the Petition Date [Docket No. 101] (the **"Varnum Retention Application"**); and, the terms and conditions of Varnum's employment are as set forth in the Varnum Retention Application.

6.      On February 11, 2013, this Court entered its Opinion and Order Regarding Debtors' Applications to Employ Varnum, LLP [Docket No. 470] granting the Varnum Retention Application pursuant to 11 U.S.C. §327(a).

7.      On February 8, 2013, this Court entered its Order Under Bankruptcy Code Sections 105(a) and 331 and Local Bankruptcy Rule 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 453] providing for the filing of monthly fee applications by professionals in this Case (the "**Interim Compensation Order**").

8.      Varnum submitted monthly fee applications pursuant to the Interim Compensation Order for the months of December, 2012, January, 2013 and February, 2013 [Docket Nos. 640, 721 and 770] for fees of $619,775.50 and expenses of $44,020.19 for a total of $630,795.69, to which no objections were made and with respect to which Certificates of No Objection were filed [Docket Nos. 698, 790  and 801] (collectively, the **"Prior Applications"**).

9.      Varnum has applied a retainer in the amount of $17,345.00 and a payment received from the Debtors in the amount of $153,366.00 to the Varnum fees and expenses in the Prior Applications.

10.      This Final Application seeks final approval and payment of Varnum's fees and expenses for the Application Period in the aggregate amount of $354,179.75 of fees and $11,009.62 of expenses for a total of $365,169.37, and final approval and payment of fees and expenses from the Prior Applications in the amount of $619,775.50 of fees and $44,020.19 of expenses for a total of $630,795.69, for a combined total of $984,975.44 of fees and $55,029.81 of expenses for a total of $1,040,005.29.

### General Description of Services Rendered by Varnum

11.      The services rendered by Varnum to the Debtors during the period of the Prior Applications and this Application Period included the following:

    a.  Preparation and prosecution of professional retention applications for appraisers Ritchie Bros. and Miedema Appraisals, to provide appraisals for use in connection with asset sales, and obtaining orders authorizing said retentions.

    b.  Preparation and prosecution of a professional retention application for Varnum as counsel to the Debtors, including a contested hearing and associated briefing precipitated by the US Trustee's objections, and obtaining an order authorizing the retention.

    c.  Preparation and prosecution of a professional retention application for O'Keefe & Associates Consulting, LLC, as Chief Restructuring Officer ("CRO") of the Debtors, including a contested hearing and associated briefing precipitated by the US Trustee's objections, and obtaining an order authorizing O'Keefe & Associates Consulting, LLC to continue as CRO without approval of retention under §327.

    d.  Opposition to the motion of the US Trustee for appointment of a Chapter 11 Trustee, including response, briefing and a contested hearing, and obtaining an order denying the motion.

    e.  Assistance to the CRO, O'Keefe & Associates Consulting, LLC, with the review, editing and filing of monthly operating reports and assistance with other reporting obligations of the Debtors, to comply with various reporting requirements established by the U.S. Trustee.

f.  Extensive assistance with the Debtors' efforts to accomplish a bulk sale of a substantial portion of the Debtors' assets pursuant to §363 of the Bankruptcy Code, including negotiation and preparation of an Asset Purchase Agreement with stalking horse party Boersen Farms, Inc., and amendments thereto.

g.  Preparation and prosecution of Debtors' motion for authorization to sell a substantial portion of the Debtors' assets at a bulk sale auction, including (i) representing the Debtors at contested hearings regarding approval of bulk sale procedures and final approval of the bulk sale, (ii) conducting the bulk sale auction, and (iii) negotiating and documenting an order and amended order approving the bulk sale.

h.  Extensive negotiations with secured creditors and landlords and development of purchase price allocations to purchase money secured creditors, resulting in the withdrawal of all objections to the bulk sale, except the objection of the U.S. Trustee.

i.  Contested hearing on the objection of the US Trustee to the bulk sale and obtaining an order overruling the objection in all respects.

j.  Consummation of the bulk sale and preparation and filing of related notices and amended allocations.

k.  Negotiations with the Estate of Michael D. Stamp regarding (i) inclusion of certain assets titled in the name of Michael D. Stamp in the bulk sale transaction and (ii) a cooperative auction sale of land and irrigation equipment.

l.  Addressing post-bulk sale closing issues, including lease assumption/assignment issues, assets to be deleted and/or added, and related purchase price adjustments.

m. Communications and negotiations with secured creditors regarding motions and related stipulations for disbursement of bulk sale proceeds, including preparation of and/or revisions to Debtors' motion, stipulations and orders.

n.  Analysis regarding and preparation of a motion for authority to sell remnant assets in a cooperative public auction with the Estate of Michael D. Stamp and in private sales, including preparation of detailed schedules of remnant assets.

o.  Communications with and assistance to counsel to the Chapter 11 Trustee in the Estate of Michael D. Stamp regarding detailed lists and locations of irrigation equipment and leased buildings to be included in a public auction sale.

p.  Review and revisions to Miedema auction contract for sale of farmland and irritation equipment at public auction.

q.  Attend 1st meeting of creditors in the Debtors' cases and in the Estate of Michael D. Stamp.

r.  Assisting the Trustee in the Estate of Michael D. Stamp with access to financial and asset information from the Debtors' data room and books and records.

s.  Research regarding perfection of various secured creditor interests in non-irrigation farm equipment and irrigation farm equipment.

t.  Assistance to the Debtors with the analysis of numerous asset ownership and recovery issues, including crop insurance claims (including numerous communications with Hudson Insurance and its counsel), unexpired farm leases, seed corn issues, casualty insurance proceeds and allocations of the bulk sale purchase price to the Debtors' assets.

u.  Review, analysis, research, responses to and negotiations regarding multiple motions to compel the assumption or rejection of farmland leases, motions for relief from stay, and objections to the various sale related motions.

v.  Responses to numerous inquiries by the Debtors relating to general case administration matters, including providing advice to the Debtors regarding questions involving insurance coverage, the payment of claims, tax related matters, real estate and equipment leasing, and various personnel related matters.

w.  Analysis regarding purported termination of counsel to the Creditors' Committee and preparation and filing of a motion to reconstitute the Creditors' Committee.

x.  Continuing review and indexing of filed claims.

y.  Extensive oral and written communications with counsel to the Trustee in the Michael D. Stamp case regarding (i) corporate governance issues, (ii) the Trustee's claimed right to convert the Stamp Farms cases to Chapter 7 automatically and without the need for a motion or notice to creditors, (iii) the impact of the expiration of the membership voting proxies, (iv) the relative duties of debtors-in-possession and Trustees to protect the interests of creditors, (v) conflicts of interest issues, (vi) the need for relief from the automatic stay before exercising control over property of the estate, and (vii) numerous related issues.

z.  Research, drafting, filing and oral arguments regarding the Court's order to show cause why the Stamp Farms cases should not be converted or a Trustee appointed.

aa. Numerous meetings in person and by phone with the Chapter 7 Trustee and her various lawyers to discuss (i) the history of the Stamp Farms cases, (ii) the causes and reasons for the bankruptcy filings, (iii) potential claims to be pursued by the Stamp Farms estates, (iv) pending motions, (v) distribution and allocation issues, (vi) case administration generally, and (vii) numerous other issues in the cases.

bb. The various matters documented in Varnum's itemized time records attached to this Final Application.

12.     All of the foregoing services have been of material value to the estate.  Through Varnum's efforts and services, which started in early December of 2012, as detailed above and in the Exhibits attached hereto, the Debtors obtained approval of the Bulk Sale, after which the Bulk Sale transaction was closed and fully funded, and approval of the Remnant Sale pursuant to which substantially all of the remaining assets of the Debtors were sold.  Notwithstanding vigorous opposition from multiple secured and unsecured creditors, in particular from the U.S. Trustee, Varnum was able to accomplish the approval of the Bulk Sale process and the consummation of the Bulk Sale in a relatively short period of time, starting on December 1, 2012, and finishing in the third week of February, 2013 (a start-to-finish process spanning approximately eleven weeks). Completing this process on such an expedited basis was essential to preserve values for the estates and their creditors.

13.     The Debtors also sold a substantial portion of their assets remaining after the Bulk Sale in a cooperative public auction with the Trustee of the Estate of Michael D. Stamp. The public auction sale closed on April 26, 2013 and funds from the sale will be paid over to the Debtors in due course.

14.     The Debtors negotiated, sought and obtained orders approving provisional and final disbursements of substantial portions of the proceeds of the Bulk Sale to secured creditors, including, research and analysis regarding the perfection of the liens of the secured creditors.

15.     At the time of conversion, the Debtors were negotiating a purchase agreement for a private sale of a substantial portion of the Debtors' remaining irrigation equipment to the purchaser under the Bulk Sale.  Other remaining irrigation equipment having no material value to the Debtors' estates were or will be the subject of stipulations for stay relief in favor of the applicable secured creditors.

16.     Throughout the Application Period, Varnum has made every effort to minimize the attorneys' fees and related expenses incurred by the Debtors.  Varnum involved a team of lawyers with billing rates on both the low end of those charged by Varnum, and on the high end of those charged by Varnum.  Every effort was made to have services performed by lawyers who were project appropriate and the least costly for each particular task.  While there were many instances in which Varnum could not complete particular tasks or sets of tasks without involving more than one lawyer, every effort was made to minimize the number of lawyers assigned to each task, or, where possible, to have tasks performed by only one lawyer.

17.     In addition, Varnum has, in good faith, made every effort possible to staff these proceedings on a "lean" basis, and to do so in such a way as to avoid material duplication of services.

18.     Attached as **<u>Exhibit A</u>** hereto is a Summary Sheet detailing the total fees and expenses requested in this Final Application, the name and billing rate for each person who billed time during the Application Period, the date of bar admission of each attorney, the total hours billed and the total amount billed for each person who billed time during the Application Period, and a computation of the blended hourly rate for all attorneys who billed time during the Application Period. There was one change in hourly rates during the Application Period for the annual adjustment that Varnum makes to its hourly rates effective January 1 of each year[2]. The hourly rates charged for fees in this Final Application are the standard hourly rates for Varnum professionals and paraprofessionals which are customarily charged by Varnum for comparably skilled professionals in other bankruptcy cases and in matters other than bankruptcy cases. The average hourly rate for the Application Period was $388.33.

---

[2] As noted in the monthly fee applications, Varnum annually adjusts its hourly rates as of January 1 each year. The increases for those Varnum professionals who billed time during the First Application Period and thereafter were as follows: (1) $5.00 per hour for Michael S. McElwee, Robert D. Mollhagen, Nathan L. Stuart, Conor B. Dugan and Dawn M. Ross. (2) $10.00 per hour for Seth W. Ashby, (3) $20.00 per hour for Benjamin A. Anderson, and (4) $25.00 per hour for David M. Moss. The hourly rate for Peter G. Roth did not change.

19.    Attached hereto as **Exhibit B** is a summary of the hours and fees billed for each professional and paraprofessional who billed time during the Application Period for each Project Category based upon the list of project categories in the Guidelines.

20.    A detailed description of the services performed in each Project Category is as follows:

**Asset Analysis and Recovery**:

On account of the number of Debtors involved in these administratively consolidated cases, the differing corporate purposes of these entities, the manner in which various items of personal property were held by these entities, the poor record keeping of the Debtors, numerous undocumented transactions of the Debtors and the disbursement of such personal property across real property owned by a large number of third parties, the analysis and recovery of assets proved to be a core undertaking of Varnum and the CRO on behalf of the Debtors.  Shortly after the cases were filed, it was discovered that the pre-petition debtors had transferred approximately $650,000 worth of grain to a third-party elevator for sale on the account of a non-Debtor.  The value of this grain was recovered by the debtor-in-possession (i.e., O'Keefe) and paid to Wells Fargo, the Debtors' secured creditor.  Many center pivot irrigation systems owned by the Debtors were situated on farms owned by third parties, including some third parties related to the Debtors (or related to the Debtors' members).  The Debtors' records regarding the location of its center pivot irrigation systems was deficient and various third parties asserted claims of ownership to center pivot irrigation systems based on asserted transfers not fully disclosed.  Varnum assisted the CRO in its efforts to identify and locate all such systems, to verify ownership of all such systems, to verify lien holders in all such systems (if any), to establish the value of such systems *in situ*, and to allocate purchase price amounts, with assistance from the Creditors' Committee counsel and its expert, Emerald Agriculture, in an economically rational way (preserving a material portion of such value

for distribution to unsecured creditors).  The Debtors owned rolling stock and farm equipment with a market value exceeding $15,000,000.  This equipment was gathered together and prepared for auction, appraised, the ownership of it was determined, and liens against it were evaluated.  Varnum reviewed claims of all secured creditors, including supporting loan documents, UCC financing statements, and mortgages, to determine the extent, validity and priority of the secured claims, including related research and numerous follow-up communications with counsel to the secured creditors requesting, receiving and analyzing additional documents and information. One adversary proceeding was filed to avoid the lien of Farm Credit Services.  Varnum and the Creditors' Committee counsel negotiated at length and over a sustained period of time with interest holders regarding valuation and allocation issues.  Varnum researched and analyzed the rights of parties in casualty insurance proceeds relating to a pre-petition casualty received post-petition and advised the Debtors to deposit the proceeds pending a future resolution of the rights of parties in the proceeds. Varnum's work on asset analysis and recovery also included numerous communications with counsel to the major secured creditor, Wells Fargo Bank, which asserts a security interest in virtually all assets of the Debtors.  Varnum also worked on the recovery of crop insurance proceeds apparently obtained by farm landlords pursuant to off-the-books agreements with Michael D. Stamp, including communications with the landlords.  Varnum also assisted the CRO and counsel to the Creditors' Committee with respect to the analysis of potential recoveries against third parties related to Michael D. Stamp, including, Melissa Stamp, Thomas Stamp and Southstar Farms, LLC. The scope of the asset analysis and recovery efforts undertaken by Varnum can be determined in greater particularity from the various sale-related papers filed by Varnum and the exhibits and schedules attached to such sale papers.

**Asset Disposition:**

Asset disposition, like asset analysis and recovery, was a core focus of Varnum in these administratively consolidated cases, and to some extent these two categories overlap. As indicated elsewhere in this filing, Varnum took these cases from the Petition Date to a confirmed sale in 11 weeks. The time was short due to the need to consummate a sale process and close and transfer ownership of the farm assets before the Spring 2013 planting season. Had the planting window closed, an advantageous sale would not have been likely to occur as buyers would have lost interest in the Debtors' assets, and values would have been steeply depressed. There were many steps that made up the fully completed sale process, including (i) asset analysis and recovery (see above), (ii) population and grooming of a data room, (iii) arranging signed confidentiality agreements with prospective buyers, (iv) sale negotiations with prospective buyers (including negotiations with the eventual stalking horse bidder) and preparation and negotiation of an Asset Purchase Agreement, (v) the drafting of sale papers (bulk sale motion, sale procedures and notices, proposed sale order, cure notices, various allocation and distributions motions, and other related papers, (vi) extensive negotiations with secured creditors and farmland landlords (the owners of the leased property farmed by the Stamp Farms Debtor) resulting in approval of the bulk sale and the remnant sales by all parties, (vii) negotiations and coordination with the Creditors' Committee and its counsel and retained experts, and (viii) many other sale-related activities. These services included the negotiation and preparation of asset purchase agreements, closing documents to close the sales, extensive work preparing and editing detailed lists and schedules of sale assets including matching the claims of secured creditors to their assets and reaching agreements with respect thereto and allocation of sales proceeds for such assets, and the preparation and filing of detailed allocation of sales proceeds with respect thereto. Varnum also worked with counsel to the Chapter 11 Trustee in the Michael D. Stamp case on a cooperative public auction sale of the land and related irrigation

equipment and farm buildings, including efforts to reach agreement on an allocation of the sales proceeds to the sale assets. Varnum also handled the closing of the bulk sale transaction, amendments to the asset purchase agreement, and numerous post-closing follow-up matters.

**Case Administration:**

Varnum's role in case administration included: (i) the preparation and filing of Petitions (and supporting papers) for each of the Debtors, (ii) the preparation and filing of schedules and statements of affairs for each of the Debtors, (iii) the preparation and prosecution of various first day motions, (iv) assistance with routine monthly reporting to the U.S. Trustee, (v) preparation for and attendance at Section 341 meetings for the Debtors, (vi) the fielding of phone calls and emails from creditors, (vii) attention to legal issues arising out of the Debtors' daily operations, and (vii) other related activities itemized in Varnum's billing statements.

**Claims Administration and Objections:**

Varnum's focus with respect to claims administration and objections, at least leading up to the approval of the Sale Order and confirmation of the sale, was on secured claims, and primarily on "purchase money security interest" or PMSI claims. Varnum negotiated stipulations with virtually all of the PMSI creditors in the Debtors' estates regarding the secured portion of such creditors' claims and thus the distribution amounts to be allocated to each of these creditors. Varnum coordinated closely on this subject with counsel for the Creditors' Committee. This effort entailed: (i) determination of the perfection status of each such claim, (ii) verification of the outstanding amount of each such claim, and (iii) determination of the value of the collateral supporting each such claim. In at least one instance, Varnum determined that a secured creditor did not have a valid or properly perfected secured claim in any amount, and objected to the claim by filing an adversary proceeding as required by Rule 7001(2).

**<u>Fee/Employment Applications</u>**:

Varnum prosecuted fee and employment applications for itself and the responsible officer of the Debtors, O'Keefe & Associates Consulting, L.L.C.. The U.S. Trustee objection to the employment application of Varnum and to the employment application to O'Keefe. The Trustee in the Michael D. Stamp case joined in the U.S. Trustee's objections. Varnum analyzed, researched and filed responses to these objections. Varnum appeared at contested hearings to defend the applications. The Bankruptcy Court eventually entered orders approving Varnum's application and denying O'Keefe's application as unnecessary.

**<u>Financing/Cash Collateral</u>**:

Varnum negotiated a series of cash collateral orders with Wells Fargo Bank, the Creditors' Committee and the U.S. Trustee. These negotiations resulting in the drafting of cash collateral motions, the filing of such motions, and the defense of such motions at contested hearings.

**<u>Litigation</u>**:

The litigation by Varnum on the Debtors' behalf in these administratively consolidated cases was undertaken primarily in response to the efforts of the U.S. Trustee and the efforts of the Trustee in the Michael D. Stamp case to (i) stop or slow the sale process or to condition it on the filing and approval of a Plan of Reorganization, (ii) appoint a trustee to replace O'Keefe, (iii) convert the Debtors' cases to Chapter 7, (vi) prevent Varnum from representing the Debtors, (v) prevent O'Keefe from representing the Debtors, and (vi) use corporate governance mechanisms to achieve one or more of these goals. The U.S. Trustee and the Trustee in the Michael D. Stamp case filed various written motion and briefs, and made various oral presentations to the Court, to accomplish these objectives. Varnum prepared and filed responses to all of these motions and briefs. The Court entered a written opinion and order approving Varnum's retention application, over the various filed objections. The Court entered a written opinion and order denying the O'Keefe application, but not

on the grounds advocate in the written objections, but instead on the grounds that the application was not necessary in the first place.  The Court ruled orally that, under the circumstances as they exist in these cases, an approved Plan of Reorganization was not a necessary condition to the approval of a sale of substantially all of the Debtors' assets.  In early May, when the member voting proxies in favor of O'Keefe expired, the Trustee in the Michael D. Stamp case made oral comments to the court suggesting that O'Keefe's authority to act on the Debtor's behalf automatically terminated when the proxies expired and that, in addition, the Trustee had terminated either O'Keefe or Varnum or both.  The Court thereafter issued an order to show cause why a trustee should not be appointed or the Debtors' cases converted to Chapter 7 of the Code.  On the Debtors' behalf, Varnum prepared and filed briefs addressing the issues raised in the Court's order to show cause. The Court eventually issued an order appointing Kelly Hagan as a Chapter 7 Trustee.

**Meeting of Creditors**:

Varnum represented the Debtors at all regularly schedule first meetings.

**Plan and Disclosure Statement**:

Varnum drafted and filed a Disclosure Statement and proposed Plan of Liquidation for the administratively consolidated Debtors, which remained pending when these cases were converted to Chapter 7.

**Relief from Stay Proceedings**:

Numerous motions for relief from stay were filed in these administratively consolidated cases, many of which were combined with assumption/rejection motions.  Varnum filed responses to most or all of these motions, while at the same time negotiating voluntary resolutions with the creditors who filed them.  The resolution of these motions was part and parcel with the distribution arrangements negotiated by Varnum and the Creditors' Committee in connection with the Sale Motion and the approval of that motion.

**Assumption/Rejection of Leases/Contracts:**

The assumption of land leases was an integral component to the sale process run by Varnum on the Debtors' behalf.  The Debtor was party to approximately 200 land leases.  These leases covered property totaling more than 25,000 acres.  The Debtors made the determination that preserving these leases was essential to an eventual bulk sale.  It was essential because a lease portfolio of this size and scope would be difficult, if not impossible, for a prospective purchaser to duplicate.  Without this much land, the extensive compliment of farm equipment and rolling stock owned by the Debtors would be of no use to a prospective purchaser and thus would have to be sold off piecemeal.  The loss of the leases would necessarily have resulted in the loss of any equity or operation value of the leases.  The irrigation equipment owned by the Debtors and located on leased acreage would have declined significantly in value, as it would have to be disassembled, moved, resold and reinstalled at new sites. Varnum, working in cooperation with the Creditors' Committee, undertook a comprehensive analysis of all land leases to which the Debtors were a party, determining the value of such leases and the likely interest of prospective purchasers in them.  Varnum also endeavored to determine the "cure" amounts  needed for assumption purposes and, again working with the Creditors Committee, determined the equity in the leases, which was unencumbered and thus available to pay unsecured creditors.

     21.    Attached hereto as **Exhibit C** are itemized time records for the period from March 1, 2013 – May 29, 2013, in chronological order by Project Category, with individual narrative time entries for each service performed on each date, including the name of the person performing the service, a description of the nature and substance of the services performed and the time expended in increments of one tenth (1/10th) of an hour.

22.     Attached hereto as **Exhibit D** are itemized statements of all expenses for which reimbursement is sought in this Final Application covering the same time periods as set forth immediately above.  With respect to these expenses, Varnum states as follows:

(a)     All expenses on Exhibit D reflect the actual cost (or less) of Varnum for each expense item.

(b)     All notice and copying costs on Exhibit D reflect the actual costs of Varnum for such items.

(c)     The filing fees for all of the Debtors were advanced by Varnum and were actually incurred in the amount reflected in Exhibit D.

23.     Varnum has not shared, and will not share, with others compensation for services rendered in these Cases.

24.     By separate motion following entry of an order approving the fees and expenses of Varnum pursuant to this Final Application, Varnum will seek an order of this Court directing Wells Fargo Bank, N.A. to make payment to Varnum of the remaining balance of undisbursed cash collateral for application to the unpaid balance of Varnum fees and expenses incurred by the Debtors during the period covered by the Final Order authorizing the use of cash collateral [Docket No. 223].

## Summary and Conclusion

25.     Varnum asserts that its fees and expenses as sought in this Final Application are reasonable and fairly and properly expended given the nature, extent and value of the services rendered, the quality and skill which was required, and the costs of comparable services in other cases.

WHEREFORE, Varnum respectfully requests that the Court (i) enter the proposed order attached as **Exhibit E** approving this Final Application, awarding the sum of $984,975.44 of fees for services rendered during the Chapter 11 Cases and $55,029.81 for out-of-pocket expenses

incurred during the Chapter 11 Cases, and authorizing the payment of the unpaid balance thereof in the amount of $869,294.25, and (ii) grant such other and further relief as is appropriate.

Dated:  August 6, 2013

Respectfully submitted,

Counsel for Debtors

/s/ Robert D. Mollhagen
Robert D. Mollhagen (P27784)
Michael S. McElwee  (P36088)
Varnum LLP
BUSINESS ADDRESS AND TELEPHONE:
P.O. Box 352 / 333 Bridge Street, N.W.
Grand Rapids, MI  49501-0352
(616) 336-6000
E-mail: rdmollhagen@varnumlaw.com
             msmcelwee@varnumlaw.com

6359308_1.DOC

16